UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

JOHN C. CANNING, JR. and )
MARIBETH CANNING, )
)
Plaintiffs, )
)
v. )     Civil No. 05-15-B-W
)
BROAN-NUTONE, LLC, )
)
Defendant. )

## AMENDED[1] ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

On August 2, 2002, a fire broke out in John and Maribeth Canning's home, causing extensive damage. The fire originated in the area of a Broan-NuTone, LLC (Broan) exhaust fan and the Cannings[2] have asserted damages against Broan claiming its fan was defective and caused the fire. Absent evidence of a specific defect, the Cannings rely on the malfunction theory, a strict liability analogue to *res ipsa loquitur*, to establish Broan's liability. Broan contends it is entitled to summary judgment, because the Cannings have not established that a replacement motor within the fan was a Broan product. Although the case is extremely close, the record here is so untidy that the resulting ambiguity at this stage favors the non-movant. Because the Court is required to view the evidence in the light most favorable to the Cannings, the Court denies the essence of Broan's motion for summary judgment; it grants Broan's motion only as to the Cannings' claims of breach of express warranty and breach of the implied warranty of fitness for a particular purpose.

---

[1] This Amended Order corrects a typographical error that appears in the last sentence of the first full paragraph of page 16 of the Order dated March 27, 2007. The March 27, 2007 Order reads "The only comfortably conclusion" and should read "The only comfortable conclusion."

[2] This is a subrogation action initiated in the names of the insureds by Vermont Mutual Insurance Company, their homeowners' insurer.

## I. STATEMENT OF FACT

John C. and Maribeth Canning reside in Augusta, Maine in a house built in the late 1960s. *Defendant's Statement of Material Facts* ¶ 1 (Docket # 46) (DSMF); *Plaintiffs' Response to Defendant's Statement of Material Facts* ¶ 1 (Docket # 49) (PRDSMF). Plaintiffs purchased the house sometime in 1998 and, on August 2, 2002, a fire broke out, causing extensive damage to their house and personal property.  DSMF ¶ 9; PRDSMF ¶ 9; *Compl.* at 1, Ex. 1 (Docket # 1).  The Cannings filed a complaint in state court against Broan, alleging that the fire was caused by a Broan exhaust fan, and alleging negligence, strict liability (14 M.R.S.A. § 221) and breach of express and implied warranties.  *Compl.* at 2-4. Broan removed the action to federal court on January 24, 2005.  *Notice of Removal* (Docket # 1).

### A. The Origin of the Fire

When the Cannings purchased their house in 1998, the upstairs bathroom contained a NuTone model 8810 exhaust fan.[3]  DSMF ¶ 2; PRDSMF ¶ 2.  The Cannings and their two children used the fan every day prior to the fire, but never experienced any problems or issues, nor did the fan ever require any maintenance or repairs.  DSMF ¶ 22; PRDSMF ¶ 22. The Cannings did not modify the fan before the fire, nor were they aware of any modifications to the fan before purchasing their house in 1998.  DSMF ¶ 3; PRDSMF ¶ 3.

Robert Long examined the fire scene to determine the fire's cause and origin.  *Pls.' Opp'n to Def.'s Renewed Mot. for Summ. J.* at 3 (Docket # 48) (*Pls.' Opp'n*).  Mr. Long is a certified fire examiner, a former fire investigator for the Maine Fire Marshal's Office, and has been performing fire investigations for eighteen years.  *Id*.; *Plaintiffs' Statement of*

---

[3] NuTone was the corporate predecessor to Broan-NuTone.  DSMF ¶ 8.

*Additional Material Facts* ¶ 2 (Docket # 49) (PSAMF); *Defendant's Response to Plaintiffs'*

*Statement of Additional Material Facts* ¶ 2 (Docket # 56) (DRPSAMF).  Mr. Long concluded

that the fan was responsible for the fire.  PSAMF ¶ 6; DRPSAMF ¶ 6.[4]  In reaching this

conclusion, Mr. Long found that under normal operating conditions, an exhaust fan would

not generate heat sufficient to start a fire, absent a defect.  PSAMF ¶ 9; *Pls.' Opp'n* at 9.  Mr.

Long also eliminated other potential causes of the fire.  He excluded owner misuse, saying

"[t]he location of the appliance's installation essentially eliminates the possibility of owner

misuse."  PSAMF ¶ 15.  He further excluded the possibility that another appliance caused the

fire, as there were no other appliances at the point of origin.  PSAMF ¶ 14.  In his report,

under "Origin and Cause," Mr. Long wrote:

> The fire damage and fire patterns consistently indicate that the
> fire originated in the second-floor bathroom wall bay where the
> exhaust fan had been mounted.  The Nutone fan was the only
> appliance at the point of origin.  Thermal patterns on the rear of

---

[4] Defendant objects to the statements of material fact concerning Mr. Long, saying "any part of the allegations . . . based on opinions concerning an alleged defect in the Fan is inadmissible in that Mr. Long is self-admittedly not qualified to offer such opinions, nor was he designated by Plaintiffs to do so. In particular, Mr. Long purports in this paragraph to opine that the fire started inside the Fan itself. He has never inspected the inside of the Fan, nor does he have the expertise to render such an opinion." DRPSAMF ¶ 6. In its Reply to the Plaintiffs' Opposition, Defendant states, "Plaintiffs' expert witness, Robert Long, unequivocally concedes that he is not qualified to opine on whether the Fan was defective." *Def.'s Reply Mem. in Supp. of Mot. for Summ. J.* at 4 (Docket # 54) (*Def.'s Reply*).

The Court agrees with Defendant that Mr. Long's own deposition testimony reveals that he does not consider himself qualified to offer opinions as to possible electrical or engineering defects within the fan in question. He stated "[M]y opinion is that the fire started inside the fan enclosure itself. The specific event that triggered it, I don't believe has been identified by any party at this point . . . . [T]here's numerous things that probably could have happened. I'm not qualified to really answer that." *Long Dep*. at 146: 13-19 (Docket # 50). The limitations of Mr. Long's expertise were made clear at several points during his deposition testimony. Indeed, Mr. Long's ability to make certain determinations was further hampered by the fact that the motor was not disassembled for his inspection. *Long Dep*. at 124: 9-10.

However, the Court does not agree that Mr. Long's expert opinions are outside the scope of what he was designated to offer. Mr. Long is a veteran fire investigator and among the principle charges of a fire investigator is to determine the cause and origin of a fire. Based on fire patterns, burn patterns and damage to the structure – all matters well-within Mr. Long's area of expertise – he concluded that "the point of fire origin is actually at the exhaust fan or adjacent to the exhaust fan . . . . [T]hermal patterns . . . are indicative that an extreme-high-heat event occurred within the appliance itself and subsequently ignited the surrounding structural materials . . . ." *Long Dep*. at 51: 23-25; 52: 1-4. Therefore, the Court notes the limitations of Mr. Long's expertise, but concludes that his findings as to cause and origin of the fire are within the scope of his expertise and 'likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola Of P.R. Bottling Co*., 161 F.3d 77, 81 (1st Cir. 1998).

> the fan housing indicate that much higher than normal
> temperatures had occurred at that location.  The cause of the
> fire is directly related to an event involving the fan.

*Confidential Origin and Cause Report* at 3-4, Ex. 1 (Docket # 56).  Finally, Mr. Long

suggested that the heat source originated from inside the fan rather than outside the fan.

PSAMF ¶ 12; *Long Dep.* at 124: 7-17 ("[T]here's been an exceptional amount of thermal

exposure at that point, probably from internal.  . . . [I]t appears that it was more . . . likely

than not an internal exposure versus an external exposure.")

### B.  The Replacement Motor

Broan sold the fan sometime between 1954 and 1972, when Broan discontinued its

production and sale.  DSMF ¶ 8; PRDSMF ¶ 8.   By August 2, 2002, the fan's original motor

had been removed and replaced with a replacement motor.  DSMF ¶ 10; PRDMSF ¶ 10.  The

Plaintiffs may only pursue their various theories of liability if the entire fan, including the

replacement motor, was, in fact, a Broan product.

### C.  The September 28, 2005 Motion for Summary Judgment

On September 28, 2005, Broan moved for summary judgment and on November 2,

2005, the Cannings objected.  *Def.'s Mot. for Summ. J.* (Docket # 10); *Pls.' Opp'n to Def.'s*

*Mot. for Summ. J.* (Docket # 18).   As originally framed, the critical factual question as to

whether the replacement motor was a Broan product remained unresolved.  On February 15,

2006, the Court held oral argument and pressed the parties to attempt to resolve this critical,

and seemingly demonstrable, factual question.  The Court agreed to re-open discovery on this

limited issue, to allow the parties to resolve it, and to file a dispositive motion, if necessary,

based on facts as established.  The same day, the Court granted Defendant's oral motion to

dismiss without prejudice its pending motion for summary judgment, and further granted the

Cannings' oral motion to amend the Scheduling Order to reopen discovery.  *Oral Motion to Dismiss without prejudice pending motion for summary judgment* (Docket # 34); *Oral Motion to Amend Scheduling Order to reopen discovery* (Docket # 35); *Oral Order* (Docket # 36).  After a series of extensions, the parties confirmed that the additional discovery had been completed and on September 15, 2006, Broan filed a new motion for summary judgment; again, the Cannings opposed.  *Def.'s Renewed Mot. for Summ. J.* (Docket # 45) (*Def.'s Mot.*); *Pls.' Opp'n*.

## II.  DISCUSSION

### A.  Standard for Summary Judgment

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "Once the movant avers an absence of evidence to support the nonmoving party's case, the latter must adduce specific facts establishing the existence of at least one issue that is both 'genuine' and 'material.'"  *Sheinkopf v. Stone*, 927 F.2d 1259, 1261 (1st Cir. 1991) (internal citation omitted).  An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law."  *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir. 2000) (citation omitted).  In applying this standard, the record is viewed in the light most favorable to the nonmoving party.  *FDIC v. Anchor Props*, 13 F.3d 27, 30 (1st Cir. 1994).

### B.  Broan's Involvement

Unfortunately, notwithstanding the parties' efforts to investigate and clarify whether the replacement motor was a Broan product, this fact remains confused and vigorously disputed.

### 1.  The Component Parts of the Fan

The fan's replacement motor contains two primary components: (1) the interior electrical design:  windings, wires, bearings and other mechanical components; and, (2) the exterior "casing," or sheet metal housing, that surrounds and encloses the electrical design. DSMF ¶ 13; PRDSMF ¶ 13.[5]

### 2.  The Deposition of James Dowell

Employed as a design and application engineer by A.O. Smith Electrical Products Company ("A.O. Smith") for approximately fifteen years, James R. Dowell was deposed by

---

[5] Plaintiffs object to this and other statements on the grounds that "[t]his paragraph is supported only by the affidavit of James R. Dowell, which is directly and without explanation contradictory to his earlier deposition testimony and which is therefore inadmissible and cannot stand as a foundation for Broan's assertion. *See Colantuoni v. Calcagni & Sons, Inc.*, 44 F.3d 1, 4-5 (1st Cir. 1994)."  The Cannings deposed Mr. Dowell on July 11, 2006.  *Dowell Dep.* (Docket # 52).  On September 15, 2006, he executed a Declaration.  In *Colantuoni*, the First Circuit stated that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." 44 F. 3d 1, 4-5.

    Here, both parties rely on Mr. Dowell's deposition testimony to support their respective position. Plaintiffs argue that "Mr. Dowell testified at his deposition that the motor involved in the fire was the current iteration of Broan's replacement motor for the NuTone Model 8810 Exhaust Fan." *Pls.' Opp'n* at 11.  Citing *Gillen v. Fallon Ambulance Serv., Inc.*, Defendant responds that "[w]hen, as here, deposition testimony is neither clear nor unambiguous, [a] subsequent affidavit that merely explains, or amplifies upon, opaque testimony given in a previous deposition is entitled to consideration' at the summary judgment stage of proceedings."  (citing to 283 F.3d 11, 26 (1st. Cir. 2002)).  Defendant argues that Plaintiffs drew impermissible inferences from Mr. Dowell's deposition testimony, explaining that "[a]lthough Mr. Dowell answered every question posed to him in deposition, additional questions were needed to fully understand the relationship . . . ." *Def.'s Reply* at 6.  *See infra* Part I.B.2-3.

    The Court agrees with the Defendant and finds *Colantuoni* inapposite.  Having carefully reviewed Mr. Dowell's deposition testimony – with an eye to whether the replacement motor was a Broan product – the Court cannot conclude that Mr. Dowell provided "clear answers to unambiguous questions."  *Colantuoni*, 44 F.3d at 4.  The very fact that each party draws mutually exclusive conclusions from Mr. Dowell's deposition testimony illustrates its ambiguity.  The Court will not disregard Mr. Dowell's subsequent declaration.

the Cannings on July 11, 2006.  DSMF ¶ 11; PRDSMF ¶ 11.  A.O. Smith is a motor manufacturer and has built motors for a variety of manufacturers, including Broan.  DSMF ¶ 12; PRDSMF ¶ 12.  A.O. Smith specifically manufactured a motor for Broan designed for the now-obsolete NuTone model 8810 fan.  DSMF ¶ 12; PRDSMF ¶ 12.

During his deposition, Mr. Dowell was shown three photographs of the replacement motor, which had been taken at the Canning house after the fire.  These photographs were marked as Exhibits 8, 9, 10.  *Dowell Dep*. Attach. 1.  Mr. Dowell was first questioned on whether A.O. Smith built the replacement motor.  *Dowell Dep*. at 38: 8-9.  After inspecting the photographs, Mr. Dowell testified that the photographs depicted "a unique design to [A.O. Smith]" and concluded "[t]hat's our motor."[6]  *Dowell Dep*. at 38: 16, 22.  Next, Mr. Dowell was questioned on when A.O. Smith built this replacement motor; Mr. Dowell testified that he believed it was manufactured sometime after 1993.  *Dowell Dep*. at 39:23-25: 39: 1-6.

Mr. Dowell was shown a schematic drawing marked as Exhibit 5.  DSMF Attach. 8 (Docket # 46).  The schematic is for "JA1M046" and indicates that it is a schematic for "Broan-NuTone LLC" and includes Broan's address.  Mr. Dowell was questioned:

> Q:  Does your company still make the motor that's identified as – I'm just going to refer to the one identified by #JA1M046 as "the" motor, from here on out, okay, just so that I don't have to say that number over and over again, all right?
> A:  As shown in Exhibit 5, yes.
> Q:  Well, let me backup.  Does you company sell this motor, "the" motor, directly to consumers if they were to call up A.O. Smith and say I need this motor?
> A:  No.
> Q:  Through what outlets does A.O. Smith sell this motor, to your knowledge?

---

[6] Mr. Dowell confirms that the photographs "reflect a motor that was manufactured by [his] company" based on the unique aspects of the design, including the absence of rivets on the faceplate, a flat area, and the vents.  *Dowell Dep*. at 37:1-5; 38: 10-22.

> A:  Only to Broan.
> Q:  So your company manufactures the motor that's reflected on exhibit five, expressly for Broan to resell.
> . . .
> A:  I don't know what they do with it.  I know we do not build a motor on speculation.  We only react to a purchase order.
> Q:  Okay.  They send your company a purchase order for a certain number of these motors and your company sends them to Broan?
> A:  Yeah.

*Dowell Dep*. at 40: 19-24; 41: 1-22.

### 3.  The Declaration of James Dowell

On September 15, 2006, Mr. Dowell filed a subsequent declaration to clarify his deposition testimony.  *Dowell Decl*. DSMF Attach. 10 (Docket # 46).  Mr. Dowell began by stating that he had personally never seen nor physically examined the actual fan in this case. *Dowell Decl*. ¶ 4.   Mr. Dowell explained that it is important to distinguish between the interior electrical design and the exterior casing, two of the primary component parts of a motor.  *Id*. ¶ 5.  Mr. Dowell stated:

> 6. The electrical design component of the motor depicted in Deposition Exhibits 8, 9 and 10 is not visible and therefore not subject to identification from those photographs.
> 7. The casing depicted in Deposition Exhibits 8, 9 and 10 was manufactured by A.O. Smith. I can make this determination from these photographs because the casing design is unique to A.O. Smith.
> 8. The casing design depicted in Deposition Exhibits 8, 9 and 10 was first put into production in 1993; therefore, the motor/casing contained in the subject fan at the time of the fire (August 2002 according to Plaintiffs) could not have been installed prior to 1993.
> 9. Between 1993 and 1998, and continuing through the present, A.O. Smith used the same casing design depicted in Deposition Exhibits 8, 9 and 10 to enclose numerous different electrical designs to create motors with a range of compatibilities for a variety of applications, only one of which is a suitable replacement motor for the NuTone model 8810 fan.

10. The casing design depicted in Deposition Exhibits 8, 9 and 10 was not and is not manufactured exclusively for Broan-NuTone. Indeed, the exterior appearance of casing model JA1M046, depicted in Deposition Exhibit 5 . . . is indistinguishable in its physical characteristics from the casing used with different style motors designed for and sold to companies other than Broan-NuTone.

11. Because *only* the fire-damaged physical casing – *and not a model number* – is visible in Deposition Exhibits 8, 9 and 10, I can confirm only that the *casing* was manufactured by A.O. Smith. I cannot discern and it is impossible to discern from viewing these photographs:

a. whether the motor, *i.e.*, electrical design enclosed within the casing, was manufactured by A.O. Smith or another company;

b. whether the motor, *i.e.*, electrical design enclosed within the casing was compatible with the 8810 model fan;

c. the source from which the motor and casing were obtained prior to the after-market installation into the subject fan;

d. whether the motor and casing were new or used when the after-market installation into the subject fan was performed;

e. what the condition of the motor and casing was at the time of the aftermarket installation into the subject fan was performed; or

f. whether the after-market installation of the motor and casing was correctly performed.

*Id.* ¶¶ 6-11 (emphasis in original).

### 4. Cannings' Argument

Based on Mr. Dowell's deposition, Plaintiffs argue that the replacement motor is a Broan product. They state:

Broan continues to argue that it is entitled to summary judgment because the fan's motor is not a Broan product. However, the deposition testimony of James R. Dowell, a senior engineer at the Broan parts supplier A.O. Smith, clearly identifies the motor involved in the fire as a replacement motor, designated as model number JA1M046, designed and manufactured for the NuTone Model 8810 Exhaust Fan. It is clear from both Broan's and A.O. Smith's mechanical drawings that the replacement motor for the NuTone Model 8810 Exhaust Fan is a Broan product, designed to its specifications.

*Pls.' Opp'n* at 5 (internal citations omitted).  The Cannings contend that Mr. Dowell's testimony is straightforward, saying, "Mr. Dowell acknowledged in his deposition that the model number shown on Exhibit 5, "JA1M046," was the model number for the motors produced for Broan, and that A.O. Smith sells the motor "JA1M046" exclusively to Broan." *Id*. at 12 (internal citation omitted).  Still, Plaintiffs go on to say:

> Even, however, if the court declines to exclude Mr. Dowell's affidavit, Plaintiffs have established a material issue of fact concerning whether the motor involved in the fire was Broan's replacement motor for the NuTone Model 8810 Exhaust Fan. It should at least be left to a factfinder to decide whether to believe Mr. Dowell's initial, untutored testimony that the motor in the photographs shown to him was Broan's current replacement motor for the NuTone Model 8810 Exhaust Fan, or his later testimony that, in fact, he cannot determine whether the motor "casing" in the pictures was the official replacement motor or not.

*Id*. at 13.

### 5.  Broan's Argument

Broan, in turn, argues that Mr. Dowell's deposition testimony does not establish that A.O. Smith manufactured the replacement motor for Broan.  Broan writes:

> Plaintiffs claim the Replacement Motor was Broan's based on statements by Mr. Dowell which, upon closer reading, *only* establish (a) that A.O. Smith manufactures replacement motors for Broan, (b) that at least the casing of the Replacement Motor at issue was manufactured by A.O. Smith; and (c) that drawings of the Broan design *look like* the motor depicted in the photographs of the Replacement Motor, which show only the exterior casing.  Mr. Dowell did *not* testify that the Replacement Motor at issue was a replacement motor manufactured by A.O. Smith *for Broan*, and no follow-up questions were asked at deposition to determine if it was appropriate to infer as much.

*Def.'s Reply* at 7.  Broan goes on to claim that Mr. Dowell's subsequent declaration makes it "absolutely clear that the inference Plaintiffs draw from his deposition testimony *is not valid.*"  *Id.* (emphasis in original).

### 6.  Analysis

When the first Broan dispositive motion was argued, the parties readily agreed that whether the replacement motor was a Broan product should be ascertainable and the Court re-opened discovery to allow them to clarify this single issue.  Now many months later, the parties have succeeded in demonstrating that the answer remains only potentially ascertainable.  The record reflects that there may be a model number inside the casing that would authoritatively reveal whether the replacement motor is a Broan product.  Presumably for their separate strategic reasons, the parties have decided not to open the exterior casing and determine what the model number is.[7]

It is as if the question debated were the contents of a closed box and, instead of opening the box, the parties have chosen to marshal facts and argue vociferously about what the box would contain if opened.  It is perplexing that after months of additional discovery directed to this narrow question, the parties have now returned with such a muddled record, leaving it for the Court to cut through predicated questions, contradictory sworn statements,

---

[7] The parties do not suggest why they have chosen to proceed by indirection.  In its argument, Broan states that the Cannings have possession of the replacement motor and have apparently "made the tactical decision not to examine and test it . . . ."  *Def.'s Reply* at 3.  But, presumably for its own tactical reasons, Broan has not sought to examine and test the replacement motor.  The parties' separate tactical decisions not to open the casing may have different consequences, depending upon the context.  By failing or refusing to answer the critical question here, the Cannings have successfully survived summary judgment, since summary judgment practice requires viewing conflicting evidence in their favor.  However, what now inures to their benefit may inure to their detriment at trial, where they bear the ultimate burden of proof.  Of course, it may be that if the casing were opened, the model number might have been obliterated by the fire, but at this point, no one knows, because the casing has not been opened.  To be clear, the Court does not question the parties' tactical judgments, which are presumably well conceived.  But, it is struck with the amount of time, energy and expense devoted to resolving by argument a matter that could be simply resolved by observation.

and contentious argument.   What should be simple remains hopelessly convoluted.   In particular, there are two distinctions plaguing the record evidence and the parties' corresponding arguments: (1) the distinction between the interior and the exterior of a motor, and (2) the distinction between photographs of the replacement motor in the fire and a schematic drawing.

### a.  Interior versus Exterior of a Motor

Mr. Dowell's declaration and Broan's memoranda make clear that the two primary components of a motor are the interior electrical wiring and the exterior casing. Unfortunately, due to the constraining predicates Plaintiffs' counsel imposed during his questioning and the absence of any subsequent clarification, Mr. Dowell's deposition testimony fails to articulate this critical distinction and he concludes, "[t]hat's our motor" without specifying which part of the motor – the interior or the exterior.  From this confused record, the Plaintiffs conclude that A.O. Smith manufactured both.

### i.  A.O. Smith Manufactured the Exterior Casing

Mr. Dowell's subsequent declaration clarifies that during his deposition he was referring only to the exterior casing.  His declaration states that the exterior casing was the only component visible in the photographs of the replacement motor and, therefore, his answers about the "motor" depicted in the photographs of the replacement motor must only concern its exterior casing.   After examining the photographs shown to Mr. Dowell, the Court concurs that the only visible component is the exterior casing.   *See* Exs. 8, 9, 10. *Dowell Dep*. Attach. 1.  When asked generally about the "motor" in the photographs, Mr. Dowell's answers necessarily concerned the only visible component of the motor.

Moreover, Mr. Dowell's subsequent clarification that he was referring only to the exterior casing is buttressed by the fact that his deposition answers were limited to design characteristics concerning the exterior casing.  In explaining the basis for his conclusion "[t]hat's our motor," Mr. Dowell identified select designs unique to A.O. Smith, including rivets on the faceplate, flat areas, and vents – all design elements concerning the exterior casing.  *See Dowell Dep.* at 38: 12-22.   Based on Mr. Dowell's deposition and his declaration, therefore, the Court finds that A.O. Smith manufactured the exterior casing of the replacement motor.

### ii. Continuing Confusion about the Interior of the Motor

Having resolved one ambiguity, the Court forges ahead.  A.O. Smith began manufacturing the exterior casing for the replacement motor in 1993 and, therefore, the exterior casing could not have been installed before 1993.  *Dowell Decl.* ¶ 8.  Between 1993 and 1998 (when the Cannings bought their house), A.O. Smith used this exterior casing to enclose numerous electrical designs to create motors with a range of compatibilities and for a variety of applications.  *Id*. ¶ 9.   Only one of those motors would have been a suitable replacement motor for the NuTone model 8810 fan.  *Id*.  According to Broan, the only way to determine definitively if the motor was the suitable replacement motor, i.e. the model of replacement motor A.O. Smith manufactures exclusively for Broan, is by the model number. Defendant claims that "[b]ecause no model number is visible in the photographs, the replacement motor simply cannot be identified as a suitable replacement part for the Fan." *Def.'s Mot*. at 11.

At bottom, Defendant argues that it is still unclear whether the replacement motor was a Broan product.   It may be that the exterior casing was coupled with the proper

electrical interior, creating the motor manufactured exclusively for Broan and the suitable replacement for the NuTone model 8810 fan.  Equally possible, however, is that the exterior casing was coupled with an electrical interior designed for another company, creating an improper replacement for the NuTone model 8810 fan and meaning that the replacement motor central to this litigation is not a Broan product.

By contrast, Plaintiffs argue that Mr. Dowell pointedly stated that this motor is manufactured exclusively for Broan.  Having already resolved that Mr. Dowell was not discussing the entirety of the motor, but instead only the exterior casing, the Court cannot agree that Mr. Dowell intended to indicate that the "motor" referenced during his deposition was *the* motor manufactured exclusively for Broan.

### b.  Photographs versus Drawing

After Mr. Dowell was questioned about the photographs of the replacement motor, he was shown Exhibit 5, the schematic drawing for "JA1M046," which indicates that it is a schematic for Broan.  *See* DSMF Attach. 8.  The Court notes that the drawing depicts only design specifications for an exterior casing.  Yet, when questioned about the drawing, Plaintiffs' attorney began by asking "Does your company still make the motor that's identified as – I'm just going to refer to the one identified by # JA1M046 as 'the' motor, from here on out, okay, just so that I don't have to say that number over and over again, all right?"  *Dowell Dep*. at 40: 19-23.  Mr. Dowell then responds "As shown in Exhibit 5, yes." *Id*. at 40:24.

Although seemingly innocuous, this exchange has generated enormous controversy. The first problem is that Mr. Dowell is being asked questions concerning the entire motor but his answers concern only the exterior casing.  The Cannings' attorney set the stage for this

confusion by labeling the exterior casing in the drawing as "the motor." Unlike the confusion generated by the questions and answers concerning the photographs of the replacement motor, here, there is, at least, some measure of clarity when Mr. Dowell moors his response to what is actually depicted in the drawing. Again, therefore, it is apparent that Mr. Dowell is discussing only the exterior casing, all that is shown in Exhibit 5.

The second problem involves the questioning of whether A.O. Smith sells "the motor" exclusively for Broan. Plaintiffs' attorney asks, "[t]hrough what outlets does A.O. Smith sell this motor, to your knowledge?" *Dowell Dep.* at 41: 6-7. Mr. Dowell responds, "[o]nly to Broan." *Id.* at 41:8. Plaintiffs' attorney goes on, "[s]o your company manufactures the motor that's reflected on exhibit five, expressly for Broan to resell?" *Id.* at 41: 9-11. Mr. Dowell responds, "I don't know what they do with it. I know we do not build a motor on speculation." *Id.* at 41: 16-17.

The trouble is that at this point in the deposition, Mr. Dowell was being shown a *Broan schematic* and then asked whether A.O. Smith manufactures *that schematic* for Broan. Mr. Dowell's affirmative answer was necessitated by the express limits of the question. Unless the Cannings independently demonstrate that the replacement motor in the fan was manufactured for Broan, it proves nothing that A.O. Smith used Broan schematics to manufacture motors exclusively for Broan.[8]

Ultimately, the Court finds that Mr. Dowell's deposition, in tandem with his declaration, demonstrate:   (1) A.O. Smith manufactured the exterior casing of the

---

[8] Mr. Dowell's declaration confirms that the critical connection to Broan was established by the fact that the schematic was labeled a Broan schematic; he says, "[t]he casing design depicted in [the photographs of the replacement motor] was not and is not manufactured exclusively for Broan-NuTone. Indeed, *the exterior appearance of casing model JA1M046, depicted in Deposition Exhibit 5 . . . is indistinguishable in its physical characteristics from the casing used with different style motors designed for and sold to companies other than Broan-NuTone.*" *Dowell Decl.* ¶ 10 (emphasis added).

replacement motor, (2) A.O. Smith manufactured the exterior casing depicted in the Broan schematic for Broan, (3) the exterior casing of the replacement motor looks like the exterior casing depicted in the Broan schematic, and (4) the exterior casing depicted in the Broan schematic is indistinguishable from an exterior casing used for companies other than Broan. Although the exterior casing of the replacement motor and the exterior casing in the Broan schematic were manufactured by A.O. Smith, it is not clear that the exterior casing in the replacement motor was manufactured for Broan.

Based on the record evidence, the Court cannot agree that "Plaintiffs have established that the replacement motor itself is a Broan product." *Pls.' Opp'n* at 11. Nor can the Court agree that Broan has established that the replacement motor is not a Broan product. *Def.'s Reply* at 5. The only comfortable conclusion is that the replacement motor may have been a Broan product.

This is enough – just barely. In the more common product liability case, the plaintiff proposes a specific defect and the defendant moves for summary judgment on the ground that, even when looking at the evidence in the light most favorable to the plaintiff, it is still entitled to summary judgment. Here, because the Cannings are unable to establish a specific defect, they bear the heightened burden to demonstrate that the nature of the incident is such that it would not have occurred without a defect in a product for which the Defendant is responsible and that they have eliminated other potential causes of the incident. In this context, Broan's motion tests whether, looking at the evidence in the light most favorable to the Cannings, the Cannings have produced enough evidence to establish these two essential elements.

16

There is really no question that, if the motor was a Broan replacement, there is sufficient evidence for the Cannings to withstand summary judgment.  After all, Broan is not so unwise to contend that its exhaust fans and replacement motors are designed, manufactured and sold in a condition so as to overheat and light their customers' homes afire and Broan has not pointed to an alternative non-Broan culprit.  Instead, Broan argues that there is insufficient evidence to establish that it is responsible for the replacement motor.

With some justification, Broan contends that a finding that it had anything to do with the replacement motor must be pure speculation, since A.O. Smith manufactured similar replacement motors for companies other than Broan.

In the Court's view, the Cannings' cumulative evidence that the replacement motor was a Broan product amounts to more than pure speculation.  The Cannings have established that the exterior casing was manufactured by a Broan supplier and that this supplier manufactured motors for Broan as replacements to the original Broan exhaust fan motor installed in the Cannings' home.  That this same supplier manufactured similar motors for other exhaust fan manufacturers and that this replacement motor may have been a non-Broan product, does not eliminate the equal likelihood that the replacement motor was a Broan product.

At the summary judgment stage, the Court is constrained to view the evidence in the light most favorable to the Cannings.  Indulging all reasonable inferences in their favor, the Court concludes that Plaintiffs have demonstrated sufficient evidence to suggest that the replacement motor was a Broan product.  Having resolved the threshold issue for purposes of summary judgment, the Court now turns to the parties' substantive legal arguments.

### C.  Strict Liability

Plaintiffs assert a claim for strict liability under 14 M.R.S.A. § 221, saying:

> 14.   The fan manufactured by Defendant was defective and unreasonably dangerous in that it malfunctioned under normal use, resulting in a fire and extensive damage to the Cannings' home.
>
> 15.   The defective condition in the subject fan rendered it unreasonably dangerous to the Cannings, who were individuals reasonably expected to use the fan.
>
> 16.   As a direct and proximate result of this defective condition, the Cannings incurred significant property damages.

*Compl.* at 3.  Maine's strict liability statute reads:

> One who sells any goods or products in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to a person whom the manufacturer, seller or supplier might reasonably have expected to use, consume or be affected by the goods, or to his property, if the seller is engaged in the business of selling such a product and it is expected to and does reach the user or consumer without significant change in the condition in which it is sold. This section applies although the seller has exercised all possible care in the preparation and sale of his product and the user or consumer has not bought the product from or entered into any contractual relation with the seller.

14 M.R.S.A. § 221.  "The Maine Legislature formulated section 221 directly from section 402A of the Restatement (Second) of Torts."  *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 537 (Me. 1986).  Products "can be in a defective condition, unreasonably dangerous to the user or consumer as a result of an error in the manufacturing or design process or the failure to warn of a product hazard."  *Id.* at 537 n.3.  In a strict liability claim, based on a design defect, the "plaintiff must prove that the product was defectively designed thereby exposing the user to an unreasonable risk of harm.  Such proof will involve an examination of the utility of its design, the risk of the design and the feasibility of safer alternatives."  *St.*

*Germain v. Husqvarna Corp.*, 544 A.2d 1283, 1285 (Me. 1988) (quoting *Stanley v. Schiavi Mobile Homes, Inc.*, 462 A.2d 1144, 1148 (Me. 1983).

### 1.  The Presence of a Design Defect

Broan first argues that there is no evidence in the record that the fan was defective and unreasonably dangerous or that it experienced any malfunction.  *Def.'s Mot.* at 3.  The Cannings, in turn, argue that the record reflects at least a factual issue concerning the existence of a design or manufacturing defect in the fan's motor.  *Pls.' Opp'n* at 7.  The parties rely on three primary cases:  *TNT Road Co. v. Sterling Truck Corp.*, 2004 U.S. Dist. LEXIS 13461 (D. Me. July 19, 2004); *Moores v. Sunbeam Prods., Inc.*, 425 F. Supp. 2d 151 (D. Me. 2006); and *Walker v. Gen. Elec. Co.*, 968 F.2d 116 (1st Cir. 1992).

#### a.  *TNT Road Co. v. Sterling Truck Corp.*

In *TNT Road Company*, a fire spontaneously erupted in, and destroyed, a truck.  The plaintiffs' fire investigator and expert opined that the fire started in or at the truck's ignition switch.  2004 U.S. Dist. LEXIS 13461, at *3.  Based on his examination, the investigator was able to rule out other components as possible causes of the fire.  *Id.* at *4.  He also made numerous observations concerning the truck's ignition switch which corroborated his conclusion.  *Id.* at *6-7.  Due to the extensive damage, however, there was no way to confirm the investigator's theory on the cause of the fire.  Thus, the crucial question was:

> [C]an the plaintiffs prove up a products liability case when their expert can point to circumstantial evidence that [the] switch was the cause and origin of the fire, but cannot point to evidence of a specific defect in the switch or the origin of the defect?

*Id*. at *15-16.  The Magistrate Judge concluded that "the law permits a products liability suit

to go forward under the circumstances of this case."  *Id*.  In its analysis, the Court noted that

Maine's strict liability statute was drawn, almost verbatim, from the Restatement and that the

Law Court looks to the Restatement, including its commentary, for guidance.  *Id*. at *17-18.

The Court pointed to the Third Restatement's acceptance of circumstantial evidence for

proving a product defect.  The Restatement reads:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
> (a) was of a kind that ordinarily occurs as a result of product defect, and
> (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Restatement (Third) of Torts, Products Liability, § 3 (1998).  The Court next points to the

American Law Institute's commentary:

> The most frequent application of this Section is to cases involving manufacturing defects. When a product unit contains such a defect, and the defect affects product performance so as to cause a harmful incident, in most instances it will cause the product to malfunction in such a way that the inference of product defect is clear. From this perspective, manufacturing defects cause products to fail to perform their manifestly intended functions. Frequently, the plaintiff is able to establish specifically the nature and identity of the defect and may proceed directly under § 2(a). But when the product unit involved in the harm-causing incident is lost or destroyed in the accident, direct evidence of specific defect may not be available. Under that circumstance, this Section may offer the plaintiff the only fair opportunity to recover.

*Id*. at *20-21 (quoting Restatement (Third) Torts, Products Liability, § 3 (1998) cmt. b).  The

Magistrate Judge ultimately denied the motion for summary judgment, finding that "[t]he

plaintiffs here have an expert who has used a reliable investigatory methodology to rule out

numerous other possible causes of the fire and to root out a specific component malfunction that would not happen in the absence of a manufacturing defect." *Id*. at *22.

### b. *Moores v. Sunbeam Products, Inc*.

In *Moores*, a fire broke out at the plaintiffs' home.  There, the fire investigator identified the source of the fire as a Sunbeam heating pad, which had been left on a recliner. After identifying the heating pad as the heat source, the fire investigator sent the remains of the pad to an electrical engineer for inspection and analysis.  425 F. Supp. 2d at 154.  The fire investigators agreed that, assuming plaintiffs' account was accurate, the heating pad was the only source of ignition.  *Id*.  Defendant then moved for summary judgment on the ground that plaintiffs designated no opinion witness to testify that "the heating pad was defective and caused the fire.  Therefore, a critical element of the plaintiffs' Complaint cannot be proven." *Id*. at 155.

The Court framed the issue as "whether the Plaintiffs have produced sufficient evidence, absent direct proof of a specific defect, to survive summary judgment."  *Id*. at 156. The Court concurred with *TNT Road Company* and denied the defendant's motion for summary judgment on strict liability grounds.  *Id*. at 158.  The Court concluded that genuine issues of material fact had been raised that precluded summary judgment, since the fire investigator determined that the origin of the fire was the recliner and eliminated causes other than the heating pad.  *Id*. at 157-58.

### c. *Walker v. General Electric Co*.

In *Walker*, a fire broke out in the plaintiffs' home.  The fire investigator concluded that the fire originated in the area around a toaster oven and, as such, opined that the toaster itself or the outlet into which it was plugged could have served as the source of ignition.  968 F.2d at 118.  A fire analyst generally concurred with the fire investigator's opinion with the notable exception that the analyst found the area of origin to include only the toaster.  *Id*. Defendant hired an electrical engineer who testified on cross-examination that he could not point to any specific defect in the toaster nor any design error which might have caused the malfunction.  *Id*.  There was also uncontradicted testimony that the plaintiffs used the toaster daily, that it functioned properly, and that it never required repair.  *Id*. at 117.  After plaintiffs rested, defendant moved for a directed verdict, which the court granted.  With regard to the strict liability claim, the district court found that the plaintiffs failed to present sufficient evidence showing defect, a necessary element of their claim.  *Id*. at 118.

In reviewing the district court's decision, the First Circuit briefly addressed the "malfunction theory."  The Court's commentary bears repeating:

> Relying on a Third Circuit case interpreting Pennsylvania's products liability law, plaintiffs argue that the application of "a malfunction theory" – whereby proof of a malfunction may be used as evidence to establish a defect  – provided a sufficient evidentiary basis to allow the case to go to the jury on the issue of defect.  *Sochanski v. Sears, Roebuck & Co*., 689 F.2d 45 (3d Cir. 1982).  We disagree.  In *Sochanski*, the court carefully specified that the "malfunction theory" did not alter the requirements of section 402(A) of the Restatement (Second) of Torts (also the basis for Maine's strict liability statute). *Sochanski*, 698 F.2d at 50.  The court was clear that "evidence of a malfunction, then, is not a substitute for the need to establish that the product was defective." *Id*. In a later Third Circuit case, the court explained that Pennsylvania's "malfunction theory" is simply a specific application of the general rules of proof in products liability cases in that a plaintiff may meet the burden of proving a defect either by pointing to some specific dereliction by the manufacturer in the

> design or construction of the product or "by showing an
> unexplained occurrence and eliminating all reasonable
> explanations for the occurrence other than the existence of a
> defect." *Ocean Barge Transport Co. v. Hess Oil Virgin Islands
> Corp.*, 726 F.2d 121, 124 (3d Cir. 1984). Plaintiff remains
> with the burden of negating other reasonable explanations for
> the malfunction. *Id*. The court concluded: Thus, the
> malfunction theory in no way relieves the plaintiff of the
> burden of proving a defect: it simply allows him to show that a
> defect is the most likely explanation for an accident by
> eliminating other reasonable explanations. The plaintiff still
> must satisfy the burden of proving that a defect is the most
> likely cause of the accident, and therefore must negate the
> likelihood of other reasonable causes. *Id*. at 125.

*Id*. at 120 (some internal citation omitted). In affirming the district court's finding, the First

Circuit concluded that "even if we were to borrow from Pennsylvania law, plaintiffs failed to

meet their burden of proof in establishing the element of defect since they failed to exclude

other reasonable explanations for the malfunction." *Id*. Indeed, both plaintiffs' and

defendant's testimony suggested that normal wear and tear could be another reasonable

explanation for the toaster's alleged malfunction. *Id*.

### d.  Analysis

Plaintiffs argue that this case is consistent with *TNT Road Company* and *Moores*.

*Pls.' Opp'n* at 7-8. Plaintiffs further argue that *Walker* is not on point because there the

plaintiffs' expert testified that normal wear and tear was an equally likely explanation for the

malfunction. *Id*. at 10. Unlike the fire investigators in *Walker*, in this case, Mr. Long has

been able to rule out all causes other than a failure of the fan. *Id*. at 11. Defendant argues

that this case is on all fours with *Walker*, and "virtually requires that judgment be entered for

Defendant." *Def.'s Mot*. at 4. Defendant argues that *TNT Road Company* and *Moores* are

inapplicable because, unlike here, the direct evidence of a specific defect was lost or

destroyed in the accident.  *Def.'s Reply* at 3.  Therefore, Defendant argues that Plaintiffs may

not benefit from relying on purely circumstantial evidence:

> Despite having exclusive possession of the Fan since the Fire, Plaintiffs apparently made the tactical decision not to examine and test it, nor to retain a qualified expert with a "reliable investigatory methodology" to articulate a theory of malfunction. Second, and most importantly, unlike in *TNT* and *Moores*, (a) Plaintiffs here have offered no admissible evidence of *any* electrical malfunction in a particular component, and (b) Plaintiffs' expert by his own admission cannot offer a qualified theory about the nature of a potential defect by tracing the fire to an electrical component that, absent a defect, should not have caused a fire.

*Id*.

The Court agrees with Defendant that this case is unlike *TNT Road Company* in that

the fire investigator was unable to point to an electrical malfunction of any particular

component.  The case is further unlike *TNT Road Company* and *Moores* in that the fan was

not lost or destroyed.  Defendant maintains that *TNT Road Company* "emphasized that 'when

the product unit involved in the harm-causing incident is lost or destroyed in the accident,

direct evidence or specific defect may not be available. *Under that circumstance*, this Section

may offer the plaintiff the only fair opportunity to recover.'"  *Id*. (emphasis in original)

(citation omitted).

It is true that an evaluation of the interior of the replacement motor has never been

performed.  Yet, the Court cannot agree that the absence of whatever information may have

been gleaned from that evaluation is dispositive.  Ultimately, this is a fact-intensive inquiry

and each of the three cases is readily distinguishable from the case at hand.  Here, the single-

most compelling factor is that Mr. Long excluded other reasonable explanations for the malfunction.  This fact alone makes *Walker* inapposite.[9]

The Court must view the facts in the light most favorable to Plaintiffs, including the fact that their expert, within the bounds of his expertise, concluded that the fire was most likely caused by a thermal event in the interior of the fan and excluded other causes.  Although the Cannings are unable to isolate a specific defect, this case is akin to *TNT Road Company* since, once other causes are eliminated, an exhaust fan does not cause a fire absent some defect.  The Court concludes that Plaintiffs have produced sufficient evidence that the fan was defective to withstand summary judgment.

### 2.  Significant Change

Broan next argues that to prevail under section 221, plaintiffs must show that the product reached "the user or consumer without significant change in the condition in which it is sold" and plaintiffs have failed to show that statutory element.  14 M.R.S.A. § 221; *Fuller v. Central Maine Power Co.*, 598 A.2d 457, 460 (Me. 1991).  Recognizing that Maine's statute is based on the Restatement, Defendant cites to the Restatement for the proposition that a manufacturer "is not liable when he delivers the product in a safe condition, and subsequent mishandling or other causes make it harmful by the time it is consumed."  *Def.'s Mot.* at 8 (quoting Restatement (Second) Torts § 402A cmt. g).  The commentary to the Restatement goes on to say that "[t]he burden of proof that the product was in a defective condition at the time that it left the hands of the particular seller is upon the injured plaintiff; and unless evidence can be produced which will support the conclusion that it was then defective, the burden is not sustained."

---

[9] Indeed, this was the basis on which the Magistrate Judge in *TNT Road Company* found *Walker* "easily distinguishable."  2004 U.S. Dist. LEXIS 13461, at *21.

Defendant relies on the affidavit of Gregory M. Bird[10] to demonstrate that the fan was a significantly different product – a product for which Broan may not be held liable – as of the time of the fire.  Broan has employed Mr. Bird for two years.  *Bird Decl.* ¶ 3.  As the Director of Product Performance, he is responsible for overseeing and investigating all product liability claims involving Broan products.[11]  *Id*.  Mr. Bird conducted research on the fan and concluded:

> a. The Fan itself is a NuTone Model 8810, which model was introduced in 1954 and discontinued from production in 1972.
> b. After reviewing the design of the Fan's motor, both in person and through photographs, it is clear that it is not the original motor utilized by NuTone in its model 8810 fan.
> c. A.O. Smith Electrical Products Company ("A.O. Smith") manufactured the casing for the Fan motor, and said casing design was not introduced by A.O. Smith until sometime in the early to mid-1990s.
> d. Given that the model 8810 fan was discontinued from production in 1972, and the A.O. Smith casing design was not utilized until the early to mid-1990s, there is a gap of at least 20 years (and possibly as large as over 40 years) between the time NuTone would have sold the Fan and the time it was modified to replace the original Fan motor.
> 6. Based on the aforementioned, the Fan motor could not be the original one intended, tested, and approved for use in the Fan.

*Bird Decl.* ¶ 5-6.  Based on Mr. Bird's declaration, Broan included the following:  "As of the time of the Fire, the Fan was a significantly different product than when NuTone originally

---

[10] Broan originally filed the affidavit of Mr. Bird on October 7, 2005.  *Bird Decl.* (Docket # 15).  On November 2, 2005, the Cannings moved to strike the affidavit and on December 13, 2005, the Court denied Plaintiffs' motion.  *Mot. to Strike Aff. Of Bird* (Docket # 20); *Order* (Docket # 31).  Broan re-filed the affidavit with its renewed motion for summary judgment.  Ex. 1 (Docket # 46).  The Court notes that, after denying Plaintiffs' motion to strike Mr. Bird's affidavit, Broan most recently filed a slightly different affidavit by Mr. Bird than the one the Court previously reviewed.  However, because the changes are not substantively important, the Court relies on the most recent affidavit.

[11] Mr. Bird is also the Director of Engineering for Kitchen Ventilation.  In this capacity, he is responsible for new product development.  *Bird Decl.* ¶ 3.  He has been in product development and engineering for more than twenty-five years.  *Id*.

sold the NuTone model 8810 fan.  Specifically, the Fan's original motor had been removed and replaced with a replacement motor (the 'Replacement Motor')."  DSMF ¶ 10.[12]

Mr. Bird's declaration clarifies that the fan was not in its original condition as of the time of the fire.  Indeed, the record is replete with information showing that the fan was not operating with its original motor but, rather, was operating with the replacement motor.  The next question, then, is whether installing the replacement motor constituted a "significant change" in the condition in which the fan was sold.

The Law Court has stated that it does "not regard a change in the manufacturer's product as significant unless the change relates to the *essential features* and to the safety of the product."  *Marois v. Paper Converting Machine Co*., 539 A.2d 621, 624 (Me. 1988) (emphasis in original).  The Court went on to say that, "even if a substantive change is made in a product, the manufacturer will not be relieved of liability unless the change was an unforeseen and intervening proximate cause of the injury."  *Id*.

Defendant argues that "[t]he motor is *the* essential feature of the Fan and relates directly to its safety – the housing and other component parts are support features to the motor's functioning. Plaintiffs have produced no evidence that the original motor was not entirely safe and free of defect when it left Broan's control . . . ."  *Def.'s Mot*. at 11 (emphasis in original).  Defendant goes on:

> Although Broan could and did foresee that motors in its exhaust fans may eventually need to be replaced, the post-sale installation of a theoretically *defective* replacement motor was

---

[12] Plaintiffs responded: "Qualified. Plaintiffs admit that the Fan's original motor had been replaced with a JA1M046 motor produced sometime after 1993. Plaintiffs deny that the Fan was a significantly different product than when NuTone originally sold the model 8810 fan, as the statement to that effect is unsupported by the citation, and states a legal conclusion. In any event, the Replacement Motor is model # JA1M046, manufactured by A.O. Smith in compliance with a drawing supplied to it by Broan, and sold by Broan as a replacement motor for its NuTone Exhaust Fan Model 8810."  PRDSMF ¶ 10.  The Court has already discussed the confusion regarding whether the replacement motor was manufactured by A.O. Smith for Broan.  *See supra* Part I.B.2-6.

"an unforeseen and intervening proximate cause" of any harm that may have resulted. As the drafters of the Model Uniform Products Liability Act ("MULPA") observed, "imposition of liability on a manufacturer or seller in cases in which an alteration or modification was in some manner foreseeable borders on imposing absolute liability…[even] when intervention by a third party was the principal cause of the accident." *American Law of Products Liability* § 43:16 (paraphrasing MULPA § 112(D), 41 Fed.Reg. 62,714 *et seq.* (1979)).

*Def.'s Mot.* at 12.  Plaintiffs respond by arguing that the replacement motor did not constitute an unforeseen change:

> Plaintiffs have established that Broan continues to sell replacement motors for the NuTone Model 8810 Exhaust Fan. There is no question, therefore, that replacement of the fan's motor was not only foreseeable to Broan, it was expected, and accordingly, Broan cannot be relieved of liability based on this change. Finally, Broan argues that Plaintiffs have not established that the installation of the replacement motor was done properly. Broan itself, however, points to the fact that Plaintiffs used the Fan daily without difficultly prior to the day on which it ignited the fire. This is circumstantial evidence that the replacement motor had been installed properly. Nor has Broan offered any evidence describing how improper installation of the replacement motor more than four years prior to the fire could have been the cause of the thermal event that started the fire.

*Pls.' Opp'n* at 13-14.

The Court agrees with Defendant that the motor is an essential feature of the fan and that it is directly related to the fan's safety.  Indeed, Plaintiffs case is grounded upon their contention that the fire was caused by a malfunction in the interior of the fan.  *See* PSAMF ¶¶ 7-13.  Thus, the Court readily concludes that there was a significant change in the fan from the condition in which it was originally sold.

However, whether this change was unforeseen unfortunately depends on whether the replacement motor was a Broan product.  Affording all reasonable inferences to the

Cannings, the Court was unable to find that the replacement motor was not a Broan product. For the purposes of summary judgment, the Court finds that the replacement motor may have been a Broan product, that is, designed and manufactured for Broan.[13]  Having made this determination, the Court cannot find that installing a Broan replacement motor into a Broan fan, for which the replacement motor was designed, was an unforeseen event.  Broan itself acknowledges that "Broan could and did foresee that motors in its exhaust fans may eventually need to be replaced . . . ."  *Def.'s Mot*. at 12.  Accordingly, the Court denies Defendant's motion for summary judgment on the issue of strict liability.

### D.  Negligence

Plaintiffs assert a claim for negligence:

> 10.  The fan owned by the Cannings and manufactured by the Defendant was defective.
> 11.  The defect with the fan caused the fire in the Cannings' home on August 2, 2002.
> 12.  The fire and damages incurred by the Cannings were the result of the negligent design or manufacture of the fan by the Defendant.

*Compl*. at 2-3.  To establish negligence, a plaintiff must demonstrate: (1) a duty owed to plaintiff by defendant, (2) a breach of that duty, and (3) that the plaintiff was injured as a result of that breach.  *Parker v. Harriman*, 516 A.2d 549, 550 (Me. 1986).  The Law Court noted that "[i]n actions based upon defects in design, negligence and strict liability theories overlap in that under both theories the plaintiff must prove that the product was defectively designed thereby exposing the user to an unreasonable risk of harm."  *Stanley*, 462 A.2d at 1148.

---

[13] Because the Court finds the replacement motor may have been a Broan product, the Court need not address Broan's argument concerning component parts manufacturers.

Defendant again cites *Walker* to summarily claim that the absence of evidence of a defect mandates judgment as a matter of law. The Court agrees that the strict liability and negligence analysis is largely the same and continues to find *Walker's* holding inapposite, given the facts of this case. The Restatement again provides guidance:

> Negligence and causation, like other facts, may of course be proved by circumstantial evidence. . . . A *res ipsa loquitur* case is ordinarily merely one kind of case of circumstantial evidence, in which the jury may reasonably infer both negligence and causation from the mere occurrence of the event and the defendant's relation to it.

Restatement (Second) of Torts, § 328D cmt. b. According to the Restatement, *res ipsa loquitur* means:

> (1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when (a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

Restatement (Second) of Torts, § 328D (1965).

Here, Plaintiffs have analogized to *TNT Road Company* and *Moores* to conclude that fans do not typically generate enough heat to cause a fire, absent a defect. Plaintiffs have excluded other reasonable causes of the fire, including other appliances and owner misuse. Finally, as a manufacturer – here, again, the Court finds, viewing the evidence in the light most favorable to the Cannings, that the replacement motor was designed and manufactured exclusively for Broan – Broan owes a duty of care to those who use its products. *See generally Cigna Ins. Co. v. Oy Saunatec*, 241 F.3d 1, 16 (1st Cir. 2001); *Wellborn v. Cobray Firearms*, 1998 U.S. App. LEXIS 3130, at *13 (10th Cir. 1998) (unpublished) ("A manufacturer owes a duty of care to those who use its product. [A] manufacturer is required

to exercise reasonable care in the planning, design, and manufacturing of a product in order to insure that it is reasonably safe to use.") (citation and punctuation omitted).  Viewing the facts in the light most favorable to Plaintiffs, the Court finds that they have satisfied the doctrine of *res ipsa loquitur* and an inference of negligence is permissible.  The Court denies the motion for summary judgment as to the claim of negligence.

### E.  Breach of Warranty

Plaintiffs assert a claim for breach of warranty:

> 18.   Defendant expressly and impliedly warranted that the subject fan was without defect, safe and reasonably fit for use by the Cannings and others who were foreseeable users of the fan.
> 19.   Defendant breached those warranties and their breach was a direct and proximate cause of the Cannings' damages.

*Compl.* at 3-4.

### 1.  Express Warranties

The Law Court has said that "[t]o prove a case based on breach of an expressed warranty one must offer evidence of an express warranty."[14]  *Williams v. Inverness Corp.*, 664 A.2d 1244, 1249 (Me. 1995).  Here, Plaintiffs offer no evidence of an express warranty. *See* DSMF ¶ 23; PRDSMF ¶ 23.[15]  As further support, Defendant includes in its motion its Interrogatory No. 22 and Plaintiffs' answer:

---

[14] Section 2-313 of the Maine Revised Statutes reads: "1) Express warranties by the seller are created as follows: a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise. b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. In the case of consumer goods sold by a merchant with respect to such goods, the description affirms that the goods are fit for the ordinary purposes for which such goods are used. c) Any sample or model which is made art of the basis of the bargain creates an express warranty that the goods shall conform to the sample or model." 11 M.R.S.A. §2-313.

[15] DSMF ¶ 23 reads "There was no applicable express warranty on the Fan at the time of the Fire."  In support of this statement, Broan cited the Cannings' answer to Interrogatory 22.  Plaintiffs respond only "Qualified. The cited material does not substantiate the statement in this paragraph."  PRDSMF ¶ 23.  The Cannings should have been more forthcoming in answering interrogatory 22 to begin with.  If they were aware of an express warranty, they should have said so; if unaware, they should have said so too.  They could have initially qualified

22. If you claim the fire was caused in whole or in part by a breach of warranty, state precisely what warranty or warranties were breached and by whom, whether such warranties were expressed or implied, whether such warranties were oral or written, the exact nature, wording and/or purported substance of each written or oral warranty, the identity of each person or entity alleged to have made each warranty, the identity of the person to whom the warranty was given, the date and place where any such warranty purportedly was made or published, and identify (or, in the alternative, attach legible copies of) all documents that refer or relate to such warranties.

ANSWER: We assumed that the fan was warranted to work safely and properly and not burn our house down.

*Def.'s Mot.* at 8.  The Plaintiffs cannot base their express warranty claim on an assumption. Absent any evidence that Broan ever made an express warranty regarding the fan, the Court grants its motion with respect to the express warranty claim.

### 2.  Implied Warranties

Plaintiffs have not specified whether they are asserting a breach of an implied warranty of fitness for a particular purpose, a breach of an implied warranty of merchantability, or both.  Turning first to implied warranties of fitness for a particular purpose, such a warranty requires:

(1) the purchaser have a particular purpose *outside* the scope of ordinary purposes; (2) the seller at the time of contracting has reason to know of the particular purpose; (3) the seller has reason to know that the purchaser is relying on the seller's skill or judgment to furnish appropriate goods; and (4) the purchaser must, in fact, rely upon the seller's skill or judgment.

---

their response to answer subject to the completion of discovery.  However once they were directly asked again after the close of discovery, they should not have qualified their response.  The Court reads the Cannings' answer to interrogatory 22 and its response to Broan's statement of material fact 23 as an admission that there was no applicable express warranty on the fan at the time of the fire.

*Lorfano v. Dura Stone Steps, Inc*., 569 A.2d 195, 197 (Me. 1990) (emphasis in original); 11

M.R.S.A. § 2-315.[16]  Plaintiffs have offered no evidence as to any of these requirements.  To

the extent their claim of breach of an implied warranty relies on fitness for a particular

purpose, summary judgment is granted.

Turning to implied warranties of merchantability, such a warranty is intended to

guarantee that a product be fit for the ordinary purposes' for which such [products] are

purchased.  *Lorfano*, 569 A.2d at 197 (citation and punctuation omitted); *Koken v. Black &*

*Veatch Constr., Inc.*, 426 F.3d 39, 51 (1st Cir. 2005); 11 M.R.S.A. § 2-314.[17]  The "first step

in the analysis is whether the good was being used for its ordinary purposes."  *Koken*, 426

F.3d at 51.  Citing the Uniform Commercial Code, the First Circuit notes that "[t]he ordinary

purposes for which goods are used . . . go to uses which are customarily made of the goods in

question."  *Id*. (quoting U.C.C. § 2-315 cmt. 2 (2004)).  Here, there is nothing to suggest that

the fan was being used for any purpose other than the ordinary purpose of circulating air.

The next step in the analysis is whether the fan was unfit for that purpose.  *Koken*,

426 F.3d at 51.  Specifically, Plaintiffs must show that the fan "because of defects either did

not work properly or [was] unexpectedly harmful."  *Lorfano*, 569 A.2d at 197 (citation and

punctuation omitted).  Here again the analysis is largely the same as that for strict liability.

Indeed, Defendant once more cites *Walker* and cursorily concludes that "[b]ecause Plaintiffs

have failed to establish any evidence that the Fan was defective . . . Broan is entitled to

judgment on Plaintiffs' breach of implied warranty claims . . . ."  *Def.'s Mot*. at 7.  Because

---

[16] The statute reads: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is . . . an implied warranty that the goods shall be fit for such purpose."

[17] The statute reads: "[A] warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . . Goods to be merchantable must at least be such as . . . Are fit for the ordinary purposes for which such goods are used." 11 M.R.S.A. § 2-314 (1)-(2)(c).

the Court has found *Walker's* reasoning inapplicable, the Court reiterates its earlier conclusion that Plaintiffs have produced sufficient circumstantial evidence of a defect.[18]  *See supra* Part II.C.1.d; *see also Suminski v. Maine Appliance Warehouse, Inc.*, 602 A.2d 1173, 1175 (Me. 1992) (stating that "[i]n some circumstances a breach of the implied warranty of merchantability under the U.C.C. may be established by circumstantial evidence.").  The Court therefore denies the motion for summary judgment on the breach of implied warranty of merchantability claim.

## III.  CONCLUSION

This decision was an extremely close one.  Quite regrettably, many of the critical points of consideration turned on the uncertainty surrounding the question of whether the replacement motor was a Broan product and the procedural posture of the case dictating that all reasonable inferences be drawn in favor of the Cannings.  Because the Court cannot definitively conclude that the replacement motor was not a Broan product, it must proceed, at this stage in the proceedings, under the assumption that it was a Broan product.  With that as a working assumption, many of the Defendant's subsequent attempts at urging the Court to grant summary judgment necessarily fail.

The Court DENIES summary judgment on the claims of strict liability, negligence, and breach of an implied warranty of merchantability.  The Court GRANTS summary

---

[18] Implied warranties relate to the product at the time it was sold.  *State v. Sears, Roebuck & Co.,* No. CV-84-133, 1985 Me. Super. LEXIS 239, at *73-74 (Me. Super. Ct., Ken. Cty., Aug. 29, 1985).  Here, of course, the fan was significantly changed when its original motor was replaced.  However, as with strict liability, that still cannot save Defendant.  Again, replacement of the original motor was foreseeable.  But, more important for purposes of implied warranties, at this stage, the replacement motor is assumed to be a Broan product. Therefore, the result is the same if the Court looks only to the replacement motor.  As the replacement motor was used without incident for several years after its initial installation, it was being used for its ordinary purpose.  The Plaintiffs' circumstantial evidence is sufficient to demonstrate that the replacement motor was unfit for that purpose.  Again, the Court infers that, absent a defect, a replacement motor does not spontaneously cause a fire.

judgment on the claims of breach of an express warranty and breach of an implied warranty of fitness for a particular purpose.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of March, 2007